## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

LINDA AVILA,                   )
                                     )
              **Plaintiff,**        )
**v.**                                )        **Civil Action No. 1:19-00066**
                                     )
**UNITED STATES OF AMERICA, *et al.*,** )
                                     )
              **Defendants.**      )

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following: (1) The United States' "Motion to Dismiss for Plaintiff's Failure to Comply with the Pre-Suit Requirements of the Medical Professional Liability Act" (Document No. 13), filed on April 12, 2019; and (2) Defendant Wright's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 15), also filed on April 12, 2019. The Court notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4ᵗʰ Cir. 1975), that Plaintiff had the right to file a response the United States and Defendant Wrights' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting her claims as they are challenged by the Defendants in moving to dismiss. (Document No. 20.) Plaintiff filed an Affidavit in Response on May 20, 2019. (Document Nos. 21, 21-1, 21-2, 21-3, 21-4.) Having examined the record and considered the applicable law, the undersigned has concluded that the United States and Defendant Wrights' Motions should be granted.

### FACTUAL AND PROCEDURAL HISTORY

On January 25, 2019, Plaintiff, acting *pro se* and an inmate at FPC Alderson filed her Application to Proceed Without Prepayment of Fees and Costs and a Complaint seeking relief pursuant to the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and for

alleged violations of his constitutional and civil rights pursuant to <u>Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971).[1] (Document Nos. 1 - 2.) In her Complaint, Plaintiff names the following as defendants: (1) United States of America; (2) Federal Bureau of Prisons ["FBOP"]; (3) Alderson Federal Prison Camp; and (4) Dr. Natalie Wright, D.O. (Document No. 2.) Plaintiff alleges that she was involved in an altercation with another inmate on June 19, 2016, wherein she suffered head trauma. (<u>Id.</u>, p. 2.) As a result of the trauma, Plaintiff states that she "blacked out." (<u>Id.</u>) Plaintiff explains that when she regained her "sight," she reported to Health Services. (<u>Id.</u>) Plaintiff acknowledges that medical staff inquired as to whether she was knocked unconscious and Plaintiff responded, "I do not remember." (<u>Id.</u>) Despite Plaintiff's foregoing response, Plaintiff complains that medical staff documented "no loss of consciousness." (<u>Id.</u>) Plaintiff acknowledges that she was taken to a contract jail, where she received additional medical treatment. (<u>Id.</u>) Plaintiff, however, complains that she did not receive proper medical treatment at FPC Alderson. (<u>Id.</u>) Plaintiff states that upon returning to FPC Alderson on July 27, 2016, Plaintiff complained of pain and was told that she could see a medical provider at a later date. (<u>Id.</u>, pp. 2 – 3.) Plaintiff claims that a facial x-ray was conducted in January 2017, which revealed that her pituitary gland was swollen. (<u>Id.</u>, p. 3.) A CT scan was conducted on February 9, 2017, which revealed Empty Sella Syndrome. (<u>Id.</u>) Plaintiff alleges that the "next step was to have an MRI, blood work called Chemical 16, and see an ENT." (<u>Id.</u>) Plaintiff, however, alleges that she was informed that "it was never going to happen, too expensive." (<u>Id.</u>) Plaintiff claims that due to the deliberate indifference and negligence by medical

---

[1]  Because Plaintiff is acting *pro se*, the documents which she has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

staff, she has suffered "a number of medical issues, memory loss, and cruel and unusual punishment, therefore, [she] will become disabled and unable to live a productive life once released." (Id.) As relief, Plaintiff requests monetary damages. (Id., p. 4.) As an Exhibit, Plaintiff attaches a copy of the denial letter dated July 25, 2018, regarding Tort Claim No. TRT-MXR-2018-04892. (Document No. 2-1.)

By Proposed Findings and Recommendation entered on February 11, 2019, the undersigned recommended that the District Court dismiss Plaintiff's Complaint as to the FBOP and FPC Alderson, and refer the matter back to the undersigned for further proceedings on Plaintiff's claims against the United States and Dr. Wright. (Document No. 4.) By separate Order entered the same day, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees as to her FTCA claim against the United States and her Bivens claim against Dr. Wright. (Document No. 5.) The Clerk issued process for the United States and Defendant Wright on the same day. (Document No. 6.) By Memorandum Opinion and Order entered on March 11, 2019, United States District Judge David A. Faber adopted the undersigned recommendation, dismissed Plaintiff's Complaint as to the FBOP and FPC Alderson, and referred the matter back to the undersigned for further proceedings. (Document Nos. 10 and 11.)

On April 12, 2019, the United States filed its "Motion to Dismiss for Plaintiff's Failure to Comply with the Pre-Suit Requirements of the Medical Professional Liability Act" and Memorandum in Support. (Document Nos. 13 and 14.) Specifically, the United States argues that Plaintiff's FTCA claim should be dismissed because she failed to comply with the Medical Professional Liability Act's ["MPLA"]. (Id.) The United States explains that Plaintiff failed to serve the provider with a notice of claim and certificate of merit at least thirty days prior to filing

3

suit. (Id.)

Also on April 12, 2019, Defendant Wright filed her "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 15 and 17.) Defendant Wright argues that Plaintiff's Bivens claim should be dismissed because: (1) "Plaintiff cannot establish an Eighth Amendment violation" (Document No. 17, pp. 8 – 15.); and (2) "Defendant Wright is entitled to qualified immunity" (Id., pp. 15 – 16.) As Exhibits, Defendant Wright attaches the following: (1) The Declaration of Natalie Wright (Document No. 19, pp. 2 – 7).; and (2) A copy of Plaintiff's pertinent medical records (Document No. 16 and Document No. 19, pp. 8 - 764.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on April 16, 2019, advising her of the right to file a response to the United States' Motion to Dismiss and Defendant Wrights' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 20.) On May 20, 2019, Plaintiff filed her Affidavit in Response. (Document Nos. 21, 21-1, 21-2, 21-3, 21-4.)

**THE STANDARD**

**Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted

as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will

support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

1. **FTCA Claim:**

An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

The FTCA, however, does not create a new cause of action. Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). The statute merely "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

In the present case, Plaintiff alleges that Defendant Wrights' negligent acts occurred in the State of West Virginia. Accordingly, West Virginia State law applies. Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6.[2] Compliance with West Virginia Code § 55-7B-6 is mandatory prior to

---

[2] West Virginia Code § 55-7B-6 provides the following in pertinent part:

6

filing suit in federal court. Stanley v. United States, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); also see Starns v. United States, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap applies to claims brought against the United States under the FTCA). West Virginia Code § 55-7B-6(c), however, provides that no screening certificate of merit is necessary where "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care."

Plaintiff alleges that BOP medical providers acted with negligence in providing treatment for her head trauma and Empty Sella Syndrome. (Document No. 2.) In its Motion, the United States contends that Plaintiff's claim should be dismissed because she failed to timely and properly file a notice of claim and a screening certificate of merit pursuant to the MPLA. (Document Nos.

---

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of Rule 15 of the Rules of Civil Procedure.

13 and 14.) Plaintiff failed to specifically address the foregoing in her Affidavit in Response. (Document No. 21.) Plaintiff, however, states that "I agree that a professional medical physician needs to evaluate my medical problems." (Id., p. 6.)

Under West Virginia law, "[i]t is the general rule that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, Roberts v. Gale, 149 W.Va. 166, 139 S.Ed.2d 272 (1964). Expert testimony, however, is not required "where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience." Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739 (2006). The MPLA provides as follows concerning claims "based upon a well-established legal theory of liability":

> Notwithstanding any provision of this code, if a claimant or his or her counsel, believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

West Virginia Code § 55-7B-6(c). In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow

and subsequent Necrosis and infection." Id. at 858.

Unlike the facts in Johnson, Plaintiff's allegations of negligence are complex and expert testimony is necessary. See Giambalvo v. United States, 2012 WL 984277 * 4 (N.D.W.Va. March 22, 2012)(finding that Johnson "is a rare exception to 'the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses.'"). In the instant case, Plaintiff contends that medical staff failed to provide appropriate treatment for her head trauma, Empty Sella Syndrome, and a swollen pituitary gland. Specifically, Plaintiff complains that medical staff failed to order an MRI and Chemical 16 blood work. The undersigned finds that what constitutes appropriate and timely treatment and testing for a head trauma, Empty Sella Syndrome, and a swollen pituitary gland is not within the understanding of lay jurors by resort to common knowledge and experience. See Lancaster v. USP Hazelton, 742 Fed.Appx. 724 (4th Cir. 2018)("The proper course of treatment for injuries such as head trauma is not within the common knowledge of a lay person."); Stacy D. v. Commissioner of Social Security, 358 F.Supp.3d 197, 213, n. 11 (N.D.N.Y. Feb. 1, 2019)(noting that "[e]mpty stella a syndrome is a *rare disorder* characterized by enlargement or malformation of a structure in the skull known as the sella turcica. The sella turcica is a saddle-shaped depression located in the bone at the base of skull (sphenoid bone), in which resides the pituitary gland. In empty sella syndrome, the sella turcica is either partially filled with cerebrospinal fluid and a very small associated pituitary gland lying in the floor of the sella (partially empty sella) or completely filled with cerebrospinal fluid with no visualized pituitary gland (completely empty sella) . . . Empty sella syndrome may occur as a primary disorder, for which the cause is unknown (idiopathic), or as a secondary disorder, in which it occurs due to a condition known as idiopathic intracranial hypertension (also call

9

pseudotumor cerebri) during which elevated intracranial pressure causes empty sella syndrome.")(emphasis added); <u>Prozer v. United States</u>, 2014 WL 6686697, * 4 (D.S.C. Nov. 25, 2014)(finding that plaintiff was required to present expert testimony to establish both the standard of care and failure to conform to the standard requiring his claim that prison medical providers failed to properly treat his head and facial injuries following an assault). In the instant case it is undisputed that Defendant Wright ordered a CT scan, a repeat CT scan, and a parathyroid hormone intact lab test. Plaintiff, however, insists that an MRI is necessary to properly evaluate her pituitary gland and a "Chemical 16" blood test is necessary to determine if she suffers from hypoparathyroidism. Clearly, it is not within the understanding of a lay person to know whether an MRI, rather than a CT scan, is necessary to properly evaluate a person's pituitary gland. Nor is it within the understanding of a lay person to know whether a "Chemical 16" blood test, rather than a parathyroid hormone intact lab test, is necessary to diagnoses hypoparathyroidism. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55-7B-6(c). The undersigned, therefore, recommends that the United States' "Motion to Dismiss for Plaintiff's Failure to Comply with the Pre-Suit Requirements of the Medical Professional Liability Act" (Document No. 13) be granted.

**2.      <u>Bivens Claim</u>:**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." <u>Turner v. Safley</u>, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A <u>Bivens</u> action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. <u>See</u> <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; <u>See also</u> <u>Carlson v. Green</u>, 446 U.S.

14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending <u>Bivens</u> to Eighth Amendment claims); <u>Davis v. Passman</u>, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending <u>Bivens</u> to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A <u>Bivens</u> action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under <u>Bivens</u> must show the violation of a valid constitutional right by a person acting under color of federal law.[3] The United States Supreme Court has held that an inmate may name a federal officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to <u>Bivens</u>. See <u>Wilson v. Seiter</u>, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However, <u>Bivens</u> claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. See <u>FDIC</u>

---

[3] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id*.

v. Meyer, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991); Reinbold v. Evers, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

In her Complaint, alleges that she was involved in an altercation with another inmate on June 19, 2016, and suffered head trauma. Plaintiff states that she "blacked out," but reported to Health Service after she regained her sight. Plaintiff acknowledges that medical staff inquired as to whether she was knocked unconscious and Plaintiff responded, "I do not remember." Despite Plaintiff's foregoing response, Plaintiff complains that medical staff documented "no loss of consciousness." Plaintiff acknowledges that she was taken to a contract jail, where she received additional medical treatment. Plaintiff, however, complains that she did not receive proper medical treatment at FPC Alderson. Plaintiff states that upon returning to FPC Alderson on July 27, 2016, Plaintiff complained of pain and was told that she could see a medical provider at a later date. Plaintiff claims that a facial x-ray was conducted in January 2017, which revealed that her pituitary gland was swollen. A CT scan was conducted on February 9, 2017, which revealed Empty Sella Syndrome. Plaintiff alleges that the "next step was to have an MRI, blood work called Chemical 16, and see an ENT." Plaintiff, however, alleges that she was informed that "it was never going to happen, too expensive."

In her Motion, Defendant Wright argue that Plaintiff cannot establish an Eighth Amendment medical claim. (Document Nos. 15 - 17.) Defendant Wright argues that Plaintiff cannot satisfy either the objective or subjective components. (Id.) Defendant Wright contends that Plaintiff was provided with timely and proper medical treatment. (Id.)

In her Affidavit in Response, Plaintiff contends that despite her numerous complaints, "I was always told everything is in the normal limits." (Document No. 21, p. 3.) Plaintiff complains

12

that medical staff "keep talking about the Empty Sella Syndrome, when I wanted to know about the pituitary gland." (Id., p. 4.) Plaintiff states that she researched the pituitary gland and since the pituitary gland was swollen, an MRI is necessary "to see if a tumor [is] present on the inside of the pituitary gland." (Id.) Additionally, Plaintiff asserts that her research revealed that "the pituitary gland produces major hormones that pass through the thyroid, and so page 1003 of the Mayo Clinic Medical Guide, it explains about how the pituitary gland works with the thyroid and it explained that acquired hypoparathyroidism is caused by a head injury, the test for this to see if the thyroid is working properly is a blood test 'Chemical 16.'" (Id., pp. 4 – 5.) Next, Plaintiff states that "because of where the pituitary gland is located, an ENT doctor would be able to diagnosis the thyroid and pituitary gland more effectively." (Id., p. 5.) Plaintiff states that "[e]ach time I tried to talk to the mid-level provider she would say this has nothing to do with the Empty Sella Syndrome because she wanted me to stay on track and stay away from the pituitary gland, which has been the problem the whole time." (Id.) Plaintiff further contends that Defendant Wright tried to "blackmail" her in to dropping her BP-9 by saying "If you drop the BP-9, we will do the blood work you want done."[4] (Document No. 21, p. 5 and Document No. 21-2.) Finally, Plaintiff alleges that Dr. Wright and her staff tried to kill Plaintiff on July 10, 16, 20, 23, 27, 30, 31[5] and August 1,

---

[4] The undersigned notes that the purpose of filing administrative remedies is for an inmate and prison staff to attempt to resolve issues. Therefore, Defendant Wright's actions appear to be a proper attempt to resolve the administrative remedy.

[5] The record reveals that Plaintiff was treated in July and August 2018, for skin problems on her abdomen. Plaintiff reported to Health Services that she had boils and sores on her abdomen. There is absolutely no indication that Plaintiff was suffering from a life-threatening condition or injury to suffer her conclusion that medical staff tried to "kill" her. A plaintiff must offer more than bare allegations or conclusory statements to survive a motion for summary judgment. *See Silling v. Erwin*, 881 F.Supp. 236, 37 (S.D.W.Va. 1995); *also see Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)(citing *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001))(courts are

13

2, 3, 4, 5, 6, 7, 8, 9, 17, 20, 23, 28, 2018, when Plaintiff was "injected with poison and watched through these dates to see how long it would take for me to die . . . but what they did not expect is that I stopped listening to my pain and listen to God." (Document No. 21, p. 7 and Document No. 21-2.)

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'")(quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation

---

not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."); *Evans v. Technologies Applications & Service, Co.*, 80 F.3d 954, 692 (4th Cir. 1996)(Summary judgment affidavits cannot be conclusory or based on hearsay); *Moore v. United States*, 1987 WL 11280 (S.D.W.Va. March 23, 1987)(Unsupported affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient to either support or defeat a motion for summary judgment).

under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Id.; also see Heyer v. United States Bureau of Prisons, 849 F.3d 202, 209-11 (4th Cir. 2017)(A "serious medical need" is a condition "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.") Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)("A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."); Morales Feliciano v. Calderson Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004)("A

constitutional violation is . . . established when government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medication attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort, or a threat to good health.") The Fourth Circuit stated the applicable standard in <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

<u>Miltier v. Born</u>, 896 F.2d 848, 851 - 52 (4th Cir. 1990)(*recognized in* <u>Sharpe v. South Carolina Dept. of Corr.</u>, 621 Fed.Appx. 732, 733 (4th Cir. 2015) *as overruled in part on other grounds by* Farmer, 511 U.S. at 837, 114 S.Ct. 1970); <u>See also</u> <u>Sosebee v. Murphy</u>, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978), <u>cert. denied</u>, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually

16

establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

In her Complaint, Plaintiff alleges that Defendant Wright acted with deliberate indifference in providing treatment for head injuries she received during an altercation with another inmate. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, a condition for which lack of treatment causes continuous severe pain or significantly affects an individual's daily life activities, or a condition diagnosed as mandating treatment or obviously requiring medical attention. Additionally, a medical need is "serious" if it "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See Heyer, 849 F.3d at 210. Plaintiff alleges that the trauma to her head caused her to suffer severe headaches, dizziness, blurred vision, and memory loss. Accordingly, the undersigned will assume for purposes of Defendant Wright's Motion that Plaintiff's injuries were serious enough to give rise to an Eighth Amendment claim.

17

See Johnson v. Proctor, 2016 WL 165020 (N.D.W.Va. Jan. 14, 2016)(Finding that allegations that an inmate suffer laceration to his forehead and head pain following head trauma stated an objectively serious injury.)

Next, the undersigned will consider whether Defendant Wright acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to her. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends Defendant Wright acted with deliberate indifference in failing to provide her with timely and appropriate treatment for her head trauma. A review of Plaintiff's undisputed medical records reveal that Plaintiff reported symptoms of dizziness, syncope (loss of consciousness caused by a drop of blood pressure), and neck pain prior to her reported head trauma. Plaintiff underwent a Health Screening at FPC Alderson on August 11, 2015. (Document No. 19, pp. 48 - 54.) Plaintiff noted that she had a history of shortness of breath and a slow heart rate. (Id.) Plaintiff stated that she had a loop recorder that records when she has an irregular heartbeat or shortness of breath. (Id.) Plaintiff further reported lumbar and right knee pain. (Id.) Defendant Wright renewed Plaintiff's medications, directed Plaintiff's vitals be checked every Tuesday and Thursday for 14 days, ordered labs, and scheduled Plaintiff for Chronic Care Visits. (Id.) Defendant Wright submitted a consult request for Plaintiff to be evaluated by an outside cardiologist, which was approved on November 9, 2015. (Id., p. 125.) On December 17, 2015,[6] Plaintiff was evaluated by Dr. Abdrhman Hamo, an outside cardiologist. (Id., pp. 111-13, 120-22.) Dr. Hamo prescribed medications, ordered a carotid ultrasound and labs, and

---

[6] Dr. Hamo did not signed his reported until January 29, 2016, and Defendant Wright did not receive his report until February 12, 2016. (Document No. 19, pp. 113 – 114.)

directed Plaintiff to monitor her blood pressure. (Id.) By Administrative Note entered on December 17, 2015, it was noted that Plaintiff had returned from her cardiology consult with an outside cardiologist. (Id., p. 20.) Plaintiff reported that the outside cardiologist wanted "some blood work and added some medicine." (Id.) By Administrative Note entered on December 17, 2015, medical staff ordered the labs requested by the outside cardiologist and ordered that Plaintiff's vitals be checked daily for 14 days. (Id., p. 18.) On January 15, 2016, Plaintiff was evaluated by Nurse Practitioner ["NP"] M. Bailey for a follow-up appointment. (Id., pp. 13 - 17.) Plaintiff reported that she "felt dizzy all the time" and when she stopped taking Zoloft, her dizziness resolved. (Id.) Plaintiff further reported a "pinched nerve" in her neck, causing her hand and arm to tingle. (Id.) NP Bailey ordered a cervical spine x-ray, provided short term use of an extra pillow to aid in alteration of sleeping position, and educated Plaintiff about conservative management of the condition. (Id.) The cervical spine x-rays were conducted on February 9, 2016, revealing negative findings. (Id., p. 109.) On February 22, 2016, NP Bailey notified Plaintiff that her cervical spine x-rays were negative. (Id., pp. 9 – 12.) NP Bailey also submitted a consultation request for a carotid ultrasound per the request from the outside cardiologist regarding Plaintiff's symptoms of syncope, dizziness, and left bruit. (Id.) Finally, NP Bailey ordered that Plaintiff's blood pressure be checked weekly for a 45-day period. (Id.) The carotid ultrasound was completed on March 24, 2016, revealing only "minor bilateral carotid plaque without significant stenosis." (Id., p. 271.) On April 6, 2016, Plaintiff was evaluated in the Chronic Care Clinic for unrelated health issues. (Id., pp. 212-16.)

On June 19, 2016, Plaintiff was evaluated by Registered Nurse ["RN"] Melissa Fox following an altercation with another inmate. (Id., pp. 207-11.) Plaintiff reported as follows: "I got

19

hit by my Bunkie. She accused me of stealing and put her hand in my face. I pushed her hand away and she hit me." (Id.) Plaintiff rated her pain as a 7 on a scale of 10. (Id.) Plaintiff was examined by RN Fox, who noted multiple reddish discoloration around the right anterior, lateral, and posterior neck, an abrasion on the right inner forearm with minimal bleeding, abrasion to the right hand just below the knuckle of the first finger with minimal bleeding, and a "golf ball size" area on the maxillary region of the right cheek with multiple sheering abrasions and minimal bleeding. (Id.) RN Fox stated that Plaintiff denied any loss of consciousness[7], blurred vision, or double vision. (Id.) RN Fox noted symmetry of motor function, right sinus tenderness, no appearance of disorientation or lethargic, and extraocular movements of eyes intact. (Id.) RN Fox cleaned all abrasions with sterile water, and applied Bandaids to the abrasions on Plaintiff's right forearm and hand. (Id.) RN Fox applied antibiotic ointment to Plaintiff's right cheek, and provided ice with instructions to apply to the right check for 15 minutes on/of for the next 24 hours. (Id.) RN Fox instructed Plaintiff to take over-the-counter pain relievers as need for pain and discomfort and report any increased headache not relieved by over-the-counter pain medications. (Id.) Finally, RN Fox ordered an x-ray of Plaintiff's face. (Id.)

Subsequently, Plaintiff was transferred to a contract jail due to the above altercation. (Id., p. 3.) Plaintiff returned to FPC Alderson on July 26, 2016, and denied any complaints or problems. (Id., pp. 201-03.) On August 1, 2016, Plaintiff was evaluated at Health Service. (Id., pp. 196-99.) Plaintiff noted her right jaw compound fracture, which she was advised would "heal over time." (Id.) Plaintiff was evaluated by NP Bailey. (Id.) NP Bailey addressed other unrelated health issues

---

[7] Plaintiff states that she did not "deny" loss of consciousness, but stated that she did not remember is she lost consciousness.

and prescribed medications. (Id.) On August 3, 2016, Plaintiff was evaluated by Defendant Wright at the Chronic Care Clinic for unrelated health issues. (Id., pp. 194-95.) Plaintiff failed to report any complaints of dizziness, headaches, or vision problems. (Id.) On August 23, 2016, Plaintiff reported to Health Services complaining of chest pain and nausea, but no shortness of breath. (Id., pp. 191-93.) Plaintiff noted that in April 2015, she passed out and her pulse was only 34. (Id.) Plaintiff was evaluated by RN Fox, who ordered an EKG. (Id.) The EKG was performed the same day and revealed normal sinus rhythm and no ectopy. (Id., pp. 192 and 265.) RN Fox referred Plaintiff to a mid-level provider for further evaluation. (Id., p. 192.) Plaintiff was evaluated by NP Bailey the same day, who noted no irregular heart rhythm and an EKG revealing a normal sinus rhythm and no ectopy. (Id., pp. 189-90.) NP Bailey assessed Plaintiff as suffering from Tietz Syndrome, which is the benign inflammation of the cartilage around the joints connecting to the upper ribs and breastbone. (Id.) NP Bailey discussed the diagnosis with Plaintiff, advised her to use warm compresses, and avoid overuse of the upper body. (Id.) Plaintiff was instructed to return immediately if her condition worsened. (Id.)

On October 20, 2016, Plaintiff submitted an "Inmate Request to Staff" requesting an increase in Flueoxetine HCI to 60 mgs because she was "shaking and always wanted to sleep." (Id., p. 263.) RN Fox responded to Plaintiff's request on October 24, 2016, noting that medications could not be increased by cop-out and that an appointment had been scheduled. (Id.) On October 31, 2016, Plaintiff reported to Health Services for her complaints of shaking, nausea, and dizziness. (Id., pp. 184-86.) Plaintiff was evaluated by RN Caitlin Stover. (Id.) RN Stover noted a slight tremor to the hand. (Id.) RN Stover obtained a urinalysis which revealed the presence of bacteria. (Id.) RN Stover placed Plaintiff on "call out" to have her blood glucose checked every Tuesday

and Thursday for 21 days. (Id.) On the same day, NP Bailey evaluated Plaintiff. (Id., pp. 187-88.) NP Bailey discussed the urinalysis results with Plaintiff and prescribed oral antibiotics as treatment for the urinary tract infection. (Id.) On November 8, 2016, Plaintiff again reported to Health Service complaining of epigastric pain, flushing, and shaking. (Id., pp. 180-83.) Plaintiff was examined by NP Bailey, who noted active bowel sounds, soft abdomen with tenderness on palpation, and fine tremors limited to hands only. (Id.) NP Bailey ordered lab work, a flat and upright abdominal x-ray, and fecal occult testing. (Id.) NP Bailey directed Plaintiff to avoid triggers to exacerbations and avoid caffeine, fried/greasy/fatty foods. (Id.) The abdominal x-rays revealed non-obstructive bowel gas patterns and no pathological calcifications. (Id., p. 252.) Plaintiff's fecal occult tests were negative. (Id.)

On November 29 and 30, 2016, Plaintiff submitted two "Inmate Request to Staff" reporting headaches, blurred vision, and tingling in the back of her neck. (Id., pp. 258 and 261.) RN Stover responded to Plaintiff's November 29th request on November 30, 2016, noting that an appointment had been scheduled. (Id., p. 261.) On December 1, 2016, Plaintiff filed an "Inmate Request to Staff" complaining that she experienced head and neck pain and numbness in her hand and feet as a result of being required to do "extra duty for not showing up to work." (Id., p. 259.) RN Stover responded to Plaintiff's December 1st request on December 8, 2016, noting that an appointment had been scheduled. (Id.) NP Bailey responded to Plaintiff's November 30th request on December 12, 2016, noting that Plaintiff had an upcoming appointment and instructing Plaintiff to place an Inmate Request for an eye exam. (Id., p. 258.) Also on December 12, 2016, NP Bailey ordered a general skull and cervical spine x-ray. (Id., p. 179.) Plaintiff's x-rays were performed on January 6, 2017. (Id., pp. 254-56.) Plaintiff's skull x-ray revealed an expanded appearance of the sella

turcica and her cervical spine x-ray revealed mild degenerative disc disease at C6 – C7. (Id.)

On January 10, 2017, Plaintiff was evaluated by Defendant Wright at the Chronic Care Clinic. (Id., pp. 173-74.) Along with unrelated health issues, Plaintiff reported experiencing headaches in the basilar part of her skull, coming up from the neck. (Id.) Plaintiff further reported experiencing headaches with reading or close work, such as knitting. (Id.) Defendant Wright examined Plaintiff, noting that Plaintiff's headaches were consistent with musculoskeletal type of pain aggravated by stress. (Id.) Defendant Wright directed Plaintiff to take warm showers and use moist compresses. (Id.) By Administrative Note entered on January 12, 2017, Defendant Wright noted she had reviewed Plaintiff's x-ray results that revealed an expanded appearance of the sella turcica. (Id., p. 172.) Defendant Wright ordered a head CT due to an expanded appearance of the sella turcica to investigate Empty Sella Syndrome or absence of sella turcica. (Id.)

On January 30, 2017, Plaintiff was called to Health Services to discuss the results of her skull x-ray. (Id., p. 170.) NP Bailey advised Plaintiff that the skull x-ray revealed an expanded appearance of the sella turcica. (Id.) NP Bailey advised Plaintiff that a CT or MRI evaluation was necessary for a detailed evaluation of the pituitary gland because a possible pituitary lesion or expansion related to partially empty sella could not be excluded by the x-ray results. (Id.) The head CT was performed on February 9, 2017. (Id., pp. 167-69, 171.) Plaintiff was evaluated at Health Services following her return from the outside facility that performed the head CT. (Id.) Plaintiff reported suffering from a headache. (Id.) The head CT report revealed the following: "There is minor supratentorial atrophy. There is no evidence of focal enhancing lesion. There is cerebrospinal fluid attenuation of the majority of the sella turcica consistent with empty sella syndrome. This usually of no significance." (Id., pp. 248-49.)

23

On February 26, 2017, Plaintiff submitted an "Inmate Request to Staff" complaining of headaches, dizziness, and blurred vision. (Id., p. 424.) Plaintiff stated she believed the medication Flueoextine could be causing some of her symptoms. (Id.) Plaintiff further requested the results of her CT scan. (Id.) RN Fox responded to Plaintiff's request on March 1, 2017, notifying Plaintiff that an appointment had be scheduled to discuss the foregoing. (Id.) On March 1, 2017, Plaintiff submitted an "Inmate Request to Staff" complaining of shaking, headaches, dizziness, and tingling at the back of her head. (Id., p. 423.) RN Cutlip responded to Plaintiff's request on March 4, 2017, noting that an appointment had been scheduled. (Id.) On March 7, 2017, Plaintiff reported to Health Services to discuss the results of her head CT. (Id., pp. 343- 44.) Plaintiff reported that she continued to have headaches "from the time I get out of the bed until I fall asleep." (Id.) Plaintiff noted that laying flat in bed on her abdomen with arms at side makes pain somewhat better. (Id.) Plaintiff explained that her headaches typically begin at the C3 area and radiate upward to the crown. (Id.) NP Bailey evaluated Plaintiff noting fine tremors to both hands with peripheral vision intact bilaterally. (Id.) NP Bailey explained to Plaintiff that the CT results showed cerebrospinal fluid attenuation of the sella turcica consistent with Empty Sella Syndrome. (Id.) NP Bailey ordered lab work including tests to evaluate hormone levels, directed Plaintiff to rest and avoid triggers to exacerbations, and report any worsening of symptoms. (Id.) Plaintiff lab results returned on March 21, 2017, revealing normal results. (Id., p. 388.)

On April 13, 2017, Plaintiff was evaluated by NP Bailey for an unrelated health issue. (Id., pp. 333-41.) On April 26, 2017, Plaintiff underwent an optometry exam. (Id., pp. 330-32.) Plaintiff reported decreased vision since her altercation with the inmate that resulted to trauma around her right eye. (Id.) Dr. Michael Adkins examined Plaintiff and noted normal findings. (Id.) Dr. Adkins

24

updated Plaintiff's eyeglass prescription and new glasses were ordered. (Id.) Plaintiff received her new eyeglasses on June 20, 2017. (Id., p. 414.) On May 17, 2017, Plaintiff had a consultation encounter regarding an unrelated health issue. (Id., pp. 326-27.) On June 1, 2017, Plaintiff reported to sick call complaining of "severe pain in the back of [her] head, shaking, blurred vision, and headaches." (Id., pp. 323-25.) Plaintiff was examined by NP Bailey, who noted normal vital signs and a normal exam. (Id.) NP Bailey again discussed Plaintiff's CT results that revealed no evidence of a focal enhancing lesion, but there was cerebrospinal fluid attenuation of the sella turcica consistent with Empty Sella Syndrome. (Id.) NP Bailey noted that the foregoing was "usually of no significance" and may be a condition Plaintiff has had since infancy. (Id.) NP Bailey, however, discussed with Plaintiff that headaches and dizziness is commonly associated with the condition. (Id.) NP Bailey prescribed Methylprednisolone for pain. (Id., p. 322.) On June 8, 2017, it was noted that Plaintiff returned from an outside medication appointment regarding an unrelated health issue. (Id., pp. 319-21.) Plaintiff reported to sick call on June 15, 2017, where RN Morgan Cutlip evaluated her for the unrelated health issue and Defendant Wright submitted a consult request. (Id., p. 314-17.)

On June 20, 2017, Plaintiff was evaluated by Defendant Wright at the Chronic Care Clinic. (Id., pp. 311-13.) Plaintiff inquired whether the etiology of her headaches was caused by the Empty Sella Syndrome. (Id.) Plaintiff reported that she takes Tylenol and finds her headaches most aggravating if she reads for a long time. (Id.) Defendant Wright counseled Plaintiff concerning Empty Sella Syndrome and that her headaches "may or may not be related." (Id.) Defendant Wright also evaluated other unrelated heath issues and renewed Plaintiff's medications.[8] (Id.) On

---

[8] Plaintiff reported that she rides the bikes five days a week to strengthen her thighs and has lost

July 31, 2017, Plaintiff was evaluated by Defendant Wright concerning follow-up on an unrelated health issue. (Id., pp. 309-10.) On August 3, 2017, RN Stover performed a medical trip return encounter following Plaintiff's return from an outside appointment regarding an unrelated health issue. (Id., pp. 306-07.) On August 14, 2017, Defendant Wright treated Plaintiff for an unrelated health issue. (Id., pp. 302-03.)

On August 15, 2017, Defendant Wright saw Plaintiff for a follow-up to discuss Empty Sella Syndrome. (Id., pp. 300-01.) Plaintiff reported that she had done some research on her own and understands it may be the etiology of her headaches. (Id.) Plaintiff requested a repeat CT scan because she had read that "a repeat scan at 6 months is a good time to see if there has been any change and base a treatment plan on that." (Id.) Defendant Wright ordered a repeat CT scan. (Id.) On August 24, 2017, Defendant Wright saw Plaintiff for a follow-up regarding unrelated health issues. (Id., pp. 298-99.) Plaintiff's repeat CT scan was conducted at an outside facility on September 13, 2017. (Id., pp. 295-97.) RN Fox saw Plaintiff for her medical trip return encounter the same day, and Plaintiff complained of a headache. (Id.) Plaintiff reported that "laying on the back of my head" was an exacerbating factor. (Id.) RN Fox noted that the IV site was clear, with no redness or swelling. (Id.) RN Fox instructed Plaintiff to use medications per instructions and that she would be scheduled for a follow-up to discuss test results. (Id.) The CT scan revealed "no acute abnormality" explaining as follows:

> There is an empty sella syndrome. The pituitary gland is in the inferior aspect of the sella. There is no pituitary stalk deviation. The gray-white matter differentiation is maintained. The ventricular system is normal. No abnormal enhancing lesions are seen. There are no air-fluid levels in the sinuses. The internal auditory canals are symmetric.

---

100 pounds. (Document No. 19, p. 311.)

(Id., pp. 402-03.)

On October 2, 2017, NP Bailey saw Plaintiff for a follow-up to review the results of her head CT. (Id., pp. 290-93.) Plaintiff reported continued "pain and swelling" to the back of her scalp and neck, and blurred vision when reading. (Id.) NP Bailey noted a normal examination and normal vital signs. (Id.) NP Bailey notified Plaintiff that the repeat CT showed no acute abnormality. (Id.) NP Bailey again discussed with Plaintiff that symptoms such as headaches and occasional vision changes may be associated with Empty Sella Syndrome. (Id.) NP Bailey also evaluated an unrelated health issue and ordered x-rays concerning such. (Id.) On October 6 and 26, 2017, Plaintiff reported to sick call for an unrelated health issue. (Id., pp. 283-89.) On December 1, 2017, Plaintiff was evaluated by NP Bailey at the Chronic Care Clinic. (Id., pp. 275-82.) Plaintiff reported that taking Mobic and Tylenol combination makes her pain more manageable and she would like to continue on the current regimen. (Id.) Plaintiff further reported that Prozac seemed to help with her pain. (Id.) NP Bailey ordered lab work and renewed Plaintiff's medications. (Id.)

On March 1, 2018, Defendant Wright saw Plaintiff for a follow-up concerning her dizziness, shaking, and headaches. (Id., pp. 550-51.) Plaintiff attributed her symptoms to the June 2016 altercation and complained that Health Services had not properly treated her despite complaints "time and time again." (Id.) Defendant Wright noted that she thoroughly reviewed with Plaintiff all her medical records revealing that long before the June 2016 altercation, consults with a cardiologist and carotid doppler studies were done to address Plaintiff's dizziness and syncope. (Id.) Defendant Wright further discussed with Plaintiff that Empty Sella Syndrome is predominantly congenital and asymptomatic. (Id.) Defendant Wright noted that Plaintiff had "latched on to a report that showed an empty sella turcica" and Plaintiff requested to have a

parathyroid hormone intact ["PTH"] lab test conducted. (Id.) Plaintiff stated she believed the PTH lab test was necessary based upon her research and her belief that her symptoms pointed to hypoparathyroidism, and she had a crushing throat injury in 2015 when she tried to hang herself. (Id.) Defendant Wright ordered the PTH lab test as requested by Plaintiff. (Id.) Plaintiff's PTH lab results returned on March 6, 2018, revealing normal results. (Id., pp. 670-72.)

On May 7, 2018, Plaintiff reported to sick call with an unrelated health issue. (Id., pp. 546-48.) On May 21, 2018, Plaintiff was evaluated by Defendant Wright at the Chronic Care Clinic. (Id., pp. 543-45.) Plaintiff reported that she was "doing well" and "finally feels she is making some headway in her recovery." (Id.) It was noted that Plaintiff's dizziness and headaches had resolved. (Id.) Between July 10, 2018 and August 28, 2018, Plaintiff was evaluated 17 times in Health Services for unrelated health issues. (Id., pp. 478 - 539.)

Between September 10, 2018 and September 19, 2018, Plaintiff filed six "Inmate Request to Staff" complaining of blurred vision, dizziness, pain at the base of her skull, poor memory, headaches, and unexplained weight loss. (Id., pp. 691-96.) Plaintiff further stated that she needed an MRI and to see an Ears, Nose, and Throat Specialist ["ENT"]. (Id.) On September 20, 2018, Plaintiff was evaluated by Dr. Joseph Dickenson following Plaintiff's submission of multiple "Inmate Requests to Staff." (Id., pp. 473-76.) Plaintiff complained of having a "poor memory" for the 3 years she has been at FPC Alderson, being unable to lie on her head following the June 2016 altercation, having "massive unexplained weight loss," waking up feeling as if "something fell into my throat," being "nauseated when concentrating or focusing with vision," having shaking with activity, and feeling as if "something is crawling in [her] head" when she exerts herself. (Id.) Dr. Dickenson noted that Plaintiff attributed her Empty Sella Syndrome to a head injury that occurred

in 2001 when her husband hit her in the face. (Id.) Plaintiff, however, stated that her weight loss, memory problems, and shaking occurred after her June 2016 altercation. (Id.) Dr. Dickenson noted that Plaintiff had lost approximately 46 pounds prior to the altercation, and only 21 pounds following the altercation.[9] (Id.) Dr. Dickenson examined Plaintiff noting normal findings. (Id.) Dr. Dickenson ordered a x-rays of Plaintiff's cervical spine and sinuses based upon Plaintiff's complaints of headaches and noted that migraine prophylaxis could be considered after the x-ray was completed. (Id.) Finally, Dr. Dickenson noted that he had discussed neuro-cognitive testing with psychology, who will advise. (Id.) The x-rays were performed on October 4, 2018. (Id., p. 687.) The x-rays of Plaintiff's sinuses were "unremarkable." (Id.) The x-ray of Plaintiff's cervical spine revealed no evidence of malalignment, no subluxation with flexion or extension, moderate disc space narrowing at C6-C7, mild bilateral intervertebral narrowing at C6-C7, minimal intervertebral narrowing at C3-C4, and mild facet arthropathy at lower cervical spine. (Id.) On October 26, 2018, Plaintiff reported to Health Service to discuss her x-ray results and complaining of an unrelated health issue. (Id., pp. 465- 67.) NP Bailey advised Plaintiff of the x-ray results. (Id.)

On September 24, 2018, November 6 and 26, 2018, December 4, 11, and 17, 2018, Plaintiff was evaluated in Health Services for unrelated health issues. (Id., pp. 439- 72.) On December 18, 2018, Plaintiff reported to sick call complaining of dizziness. (Id., pp. 435-38.) Plaintiff reported that she had "dizzy spells and almost fell out of bed two or three times during the night" and had blurred vision when starting to stand. (Id.) Plaintiff was examined by NP Bailey, who noted normal

---

[9] On September 20, 2018, Plaintiff weighed 216 pounds and she weighed 283 on in August 2015. On June 20, 2017, Plaintiff reported to medical staff that she rides the bikes five days a week to strengthen her thighs and had lost 100 pounds. (Document No. 19, p. 311.)

findings. (Id.) NP Bailey discussed vertigo with Plaintiff and instructed her to try to identify triggers. (Id.) NP Bailey ordered lab work and instructed Plaintiff report any worsening of condition. (Id.) The lab work revealed Plaintiff had low B12 level and a follow-up appointment was scheduled. (Id., p. 432.) On January 15 and 29, 2019, Plaintiff was evaluated in Health Services for unrelated health issues. (Id., pp. 428-34.)

Based upon the foregoing, Plaintiff cannot satisfy the subjective component. The foregoing does not exhibit that Defendant Wright knew of and disregarded Plaintiff's need for medical treatment or testing for the head trauma she allegedly suffered on June 19, 2016. First, Plaintiff complains that she informed medical staff that she did not remember if she lost consciousness, but medical staff noted in her medical records "no loss of consciousness." Although medical staff may not have correctly documented that Plaintiff's loss of consciousness was unknown, such a failure alone does not constitute deliberate indifference. The record reveals that Plaintiff was thoroughly examined by medical staff, who noted no blurred or double vision, symmetry of motor function, no appearance of disorientation or lethargic, and extraocular movement of eyes intact. The record further reveals that medical staff ordered an x-ray of Plaintiff's face and instructed Plaintiff to report any increased headache not relieved by over-the-counter pain medication. Thus, the record is void of any indication that medical staff knew Plaintiff was suffering adverse symptoms as a result of losing consciousness and disregarded such.

Next, Plaintiff contends that Defendant Wright acted with deliberate difference in providing treatment for her Empty Sella Syndrome. Plaintiff appears to indicate that she believes her Empty Sella Syndrome was caused by the head trauma she suffered on June 19, 2016. Plaintiff contends that Defendant Wright failed to provide adequate treatment for her Empty Sella

Syndrome because the "next step [after the head CT] was to have an MRI, blood work called Chemical 16, and see an ENT." Although it appears undisputed that headaches can be a symptom of Empty Sella Syndrome, the record reveals that Plaintiff failed to complain of headaches until November 29, 2016. In combination with her complaint of headaches, Plaintiff complained of neck pain, blurred vision, and tingling in her neck.[10] Plaintiff was examined by medical staff less than two weeks later (December 12, 2016), and x-rays of the general skull and cervical spine were ordered. The x-rays were performed on January 6, 2017. Plaintiff's skull x-ray revealed an expanded appearance of the sella turcica and her cervical spine x-ray revealed mild degenerative disc disease at C6 – C7. Less than a week after receiving Plaintiff's x-ray results, Defendant Wright ordered a head CT due to an expanded appearance of the sella turcica to investigate Empty Sella Syndrome or the absence of sella turcica. The head CT was performed on February 9, 2017, and the radiologist's report noted no pituitary lesion and "cerebrospinal fluid attenuation of the majority of the sella turcica consistent with empty sella syndrome. This usually of no significance." Approximately three weeks later, medical staff ordered lab work including tests to evaluate hormone levels. Thus, there is no indication that Defendant Wright knew Plaintiff's condition required an MRI[11] and blood work called "Chemical 16," and failed to order such. The record

---

[10] The record clearly reveals that Plaintiff complained of blurred vision, tingling in her neck, neck pain, and shaking prior to the June 19, 2016 altercation.

[11] Plaintiff appears to argue that an MRI and additional blood testing was necessary because her pituitary gland was swollen. Although Plaintiff claims that her January 6, 2017, x-ray revealed that her pituitary gland was swollen, Plaintiff is mistaken. Plaintiff's January 6, 2017, x-ray revealed an expanded appearance of the sella turcica. (Document No. 19, pp. 254-56.) The sella turcica is a saddle-shaped indentation in the sphenoid bone at the base of the skull that houses the pituitary gland. (*Id.*, p. 6.) Neither the x-ray nor the follow-up CT scans revealed a swollen pituitary gland. (*Id.*, pp. 254-56, 248-49, 402-03.) The CT scans revealed cerebrospinal fluid attenuation of the sella turcica consistent with Empty Sella Syndrome. (*Id.*) The CT scans further revealed that "the

reveals that medical staff evaluated Plaintiff and provided treatment following each sick-call request. Specifically, medical staff consistently evaluated Plaintiff's condition, ordered lab work, x-rays, CT scans, and an ultrasound, prescribed medications, instructed Plaintiff to request an eye exam, and referred Plaintiff to an "outside" cardiologist. The record further reveals that after continuous complaints from Plaintiff attributing all her symptoms to her Empty Sella Syndrome, Defendant Wright ordered a repeat CT scan and a lab test for hypoparathyroidism as requested by Plaintiff. Plaintiff's CT scan remained unchanged with "no acute abnormality" and her PTH[12] lab was normal. There is absolutely no indication that Defendant Wright knew Plaintiff's Empty Sella Syndrome required additional testing or treatment and she failed to order such. The record reveals that medical staff made sufficient efforts to diagnose and treat Plaintiff's symptoms (blurred vision, dizziness, headaches, and shaking). See Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998)(finding that a misdiagnosis of a pituitary tumor was insufficient to establish deliberate indifference where physicians treated symptoms presented by inmate and consulted with specialists); Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008)(a "negligence medical diagnoses or treatment, without more, do not constitute deliberate indifference"). In the instant case, Plaintiff appears to simply disagree with the appropriate course of treatment. An inmate's

---

pituitary gland is in the inferior aspect of the sella" and "there is no pituitary stalk deviation." (*Id.*, pp. 402-03.) When there is cerebrospinal fluid attenuation of the sella turcica consistent with Empty Sella Syndrome, this means the sella turcica enlarges and the pituitary gland remains normal-sized or shrinks. *See* https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/pituitary-gland-disorders/empty-sella-syndrome.

[12] Plaintiff claims that hypoparathyroidism is caused by a head injury, and the test to determine whether the thyroid is working properly is a blood test called "Chemical 16." The record reveals that Defendant Wright ordered a PTH lab based upon Plaintiff's belief that she had hypoparathyroidism, and the results were normal.

disagreement with his medical care or the course of treatment for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation."); Johnson v. Proctor, 2016 WL 165020, at * 6 – 7 (N.D.W.Va. Jan. 14, 2016)(finding that inmate's allegations that the physician made no attempts to diagnose his head injury, provide treatment other than Tylenol, or order a MRI or CT scan were insufficient to state a claim upon which relief could be granted under the Eighth Amendment). Accordingly, the undersigned finds that Defendant Wright did not act with deliberate indifference in providing medical treatment for Plaintiff's condition. The undersigned finds it unnecessary to consider the other reasons which the Defendant Wright has submitted for dismissal regarding Plaintiff's Bivens claim.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** the United States' "Motion to Dismiss for Plaintiff's Failure to Comply with the Pre-Suit Requirements of the Medical Professional Liability Act" (Document No. 13), **GRANT** Defendant Wright's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 15), and remove this matter from the Court's docket.

33

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Faber and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: November 4, 2019.

Omar J. Aboulhosn
United States Magistrate Judge